UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Criminal No. 23-mj-04293-DHH |
| JACK DOUGLAS TEIXEIRA, | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

## <u>MEMORANDUM AND ORDER ON DETENTION</u>

**May 22, 2023**

Hennessy, M.J.

Probable cause exists to believe that Defendant disclosed National Defense Information, with the intent or reason to believe it would be used to the injury of the United States, in violation of 18 U.S.C. § 793(b) and (d), and that Defendant removed and retained without authorization Classified Information, in violation of 18 U.S.C. § 1924. The United States alleges in a criminal complaint that Defendant used his top secret security clearance as an Air National Guardsman to access and publish on a social media platform national defense information, including information about the Russia-Ukraine conflict. The United States has moved to detain Teixeira pretrial on grounds that he is a serious risk of flight and a serious risk of obstructing justice. [Dkt. No. 19]. Teixeira waived a preliminary hearing. [Dkt. Nos. 2, 15]. For the reasons stated below, I grant the motion to detain Teixeira on each ground.

## I.     FACTUAL RECORD

The Court held a detention hearing on April 27, 2023 at which it received testimony, an exhibit, and argument, and on May 19, 2023. [Dkt. Nos. 23, 36]. In addition, the Parties submitted

memoranda in support of their positions.  [Dkt. Nos. 19, 20, 33, 34].  The Court relies on these

submissions and the Criminal Complaint Affidavit ("Affidavit") to make the following record.

Defendant is 21 years old and was born and raised in Massachusetts.  [Dkt. No. 20, p. 2].

He attended Dighton Rehoboth High School which graduated him in 2019.  [Dkt. Nos. 19-5, p.1;

19, p. 5].  In 2019, when Defendant was still 17 years old, he enlisted in the U.S. Air National

Guard ("USANG").  [Dkt. Nos. 19, p. 5; 20, p. 2].  In August 2020, Defendant attended basic

training at Lackland Air Force Base in Texas; in February 2021 and April 2021, he attended

information technology and cyber security courses at Kessler Air Force Base in Mississippi.  [Dkt.

No. 19-10].  Defendant was assigned to the 102d Intelligence Wing of the Massachusetts Air

National Guard at Otis Air National Guard Base on Cape Cod, as a Cyber Transport Specialist.

[Dkt. Nos. 19-5; 20, p. 2].  In July 2021, USANG granted Defendant Top Secret ("TS") and

Sensitive Compartmented Information ("SCI") access and provided security indoctrination.  [Dkt.

Nos. 19, p. 4; 19-1].  Since May 2022, Defendant has served in active duty as an E-3/Airman First

Class with the title of Cyber Defense Operations Journeyman.  [Dkt. Nos. 19, p. 4; 20, pp. 3-4].

During his assignment to USANG, Defendant resided with his mother and stepfather (a 34-year

veteran of the 102d Intelligence Wing) in North Dighton.  [Dkt. No. 20, pp. 2-3].

According to a Government Audit, beginning on February 26, 2022 (just days after the

Russian invasion of Ukraine), Defendant conducted hundreds of searches on a U.S. Government

Agency's classified network.  [Dkt. No. 19-4].  In doing so, Defendant accessed classified reports

and documents containing U.S. National Defense information.  [Id.].  The subjects of Defendant's

searches included the Russia-Ukraine conflict, Ruby Ridge, Las Vegas shooting, Mandalay Bay

shooting, Buffalo Tops shooting, and Uvalde.  [Id.].  These searches were unrelated to Defendant's

duties in USANG.  [Dkt. Nos. 19, p. 4; 34-4, ¶5].  Defendant thereafter posted some classified

information on three servers, one of which had at least 150 users foreign and domestic, within a social media platform.  [Dkt. Nos. 3-1, ¶15; 34-1, ¶4].  Records of the social media platform show that between November 1, 2022 and April 7, 2023, Defendant sent over 40,000 messages.  [Dkt. No. 19-8, p. 2].  One message, dated November 23, 2022, contained the following exchange:

> Unidentified User:  Isnt (sic) that shit classified?
>
> Defendant:  everything that ive (sic) been telling u (sic) guys up to this point has been lol[.]  This isn't different[.]
>
> Unidentified User:  Well you rly (sic) trust everyone here then[.]
>
> Defendant:  I have plausible deniability and non[e] of them know anything incriminating about me.  No one has a point of contact to my work[.]  No one knows where i work[.] and no one knows how to identify me[.]  D[on't] w[orry] ive thought of that[.].

[Dkt. No. 19-8, p. 4].

In April 2023, agents from the Federal Bureau of Investigation ("FBI") interviewed a user on the server on which Defendant posted classified information in an effort to identify the source of leaked confidential information.  The user told agents: a person the user identified as Defendant and the server's administrator began posting what appeared to be classified information on the server in or about December 2022, [id., ¶¶15, 19-22]; at first, Defendant posted such information as paragraphs of text, [id., ¶16]; thereafter, in January 2023, Defendant began posting photographs of documents that contained what appeared to be classified markings, [id.].  Defendant had told the user that Defendant had become concerned that he might be discovered copying text, so Defendant began taking documents to his home and photographing them.  [Id., ¶18].  One document Defendant posted described the status of the Russia-Ukraine conflict, including troop movements.  [Id., ¶17].  This document is classified TS/SCI and relies on sensitive U.S. intelligence gathered from classified methods and sources.  [Id.].  Defendant accessed and posted

this document in February 2023, one day before the user re-posted the contents on the Internet.

[Id.].

On December 13, 2022, this is what Defendant texted over the social media platform:

Since you wanted the full report instead of the brief few summaries I give in [redacted] here you go.  I've reported stuff like this almost daily as I get it to my friends and have always done it in this format….I have not yet done today[']s….I also omit a decent amount as I don't think it's pertinent and there's just so much of it….Not gonna type out 35 pages of information….So I tailor it and take important parts and include as many details as possible.

[Dkt. No. 19-8, p. 5].  On March 19, 2023, Defendant posted the following, in part:

Like to thank everyone who came to the thread about the current event…I was very happy and willing and enthusiastic to have covered this event for the past year and share with all of you something that not many people get to see… but I've decided to stop with the updates….If you guys do want happenings that pertain to your country or events or politics or whatever you can DM me and I can tell you what I have….

[Id.].  On April 7, 2023, was the following exchange:

Unidentified User:  it[']s so over[.]

Defendant:  I k[now.] D[on't ]w[orry] about it.

…

Defendant:  If anyone comes looking, don't tell them shit.

Unidentified User:  won[']t[.] won[']t send any info on your account or screencaps[.]

Defendant: Pass this on to [redactions referring to four other users] and most others who were in that thread.
…

Defendant: Whenever you get this, try to delete all my messages in civil discussions.

…

Defendant: Just find stuff from Feb 2022 in civil discussion and delete it during your free time.

On April 13, 2023, New York Times reporters seeking to interview Defendant appeared at Defendant's home and suggested to Defendant's mother that Defendant leaked classified information.  [Hg. Tr. p. 36].  Defendant complied with his mother's request to come home.  [Id.].  Indeed, later that day, officers arrested Defendant at home; Defendant was on the porch reading the Bible.  [Id.].

Just before Defendant's arrest, he told a fellow Airman that he had a new cellphone because his old phone flew out the window of his truck while he was driving and was run over by a semi-truck.  [Dkt. No. 19-4, ¶11].  Following Defendant's arrest on April 13, 2023, agents conducted a search at his home.  [Dkt. No. 19, p. 7].  In a dumpster, agents recovered a tablet, laptop, and Xbox gaming console.  [Id.].  All three devices had been physically smashed.  [Id.].

## II.     THE MOTION FOR DETENTION

As noted, the United States has moved for detention based on a serious risk of flight and of obstructing justice.  [Dkt. No. 19].

### A.     The Bail Reform Act of 1984

A judicial officer may order a defendant detained pending trial if the United States establishes by a preponderance of the evidence that a defendant poses a serious risk of flight.  18 U.S.C. § 3142(f); see United States v. Patriarca, 948 F.2d 789, 792–93 (1st Cir. 1991); United States v. Berrios-Berrios, 791 F.2d 246, 250 (2d Cir. 1986), cert. denied, 479 U.S. 978 (1986).  The judicial officer may then detain a person pending trial only if the judicial officer determines that "no condition or combination of conditions [set forth under 18 U.S.C. § 3142(b) or (c)] will reasonably assure the appearance of the person as required…."  18 U.S.C. § 3142(e).

In making this determination the judicial officer must consider the following factors, enumerated in 18 U.S.C. § 3142(g):

(1)     the nature and circumstances of the offense charged, including whether the offense is a crime of violence, [sex trafficking of children], a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive or destructive device;

(2)     the weight of the evidence against the person;

(3)     the history and characteristics of the person, including--

    (A)     the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and,

    (B)     whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4)     the nature and seriousness of the danger to any person or the community that would be posed by the person's release . . . .

A serious risk that a released defendant will obstruct justice is a basis of detention independent of risk of flight.  See 18 U.S.C. § 3142(f)(2)(B) ("a serious risk that such person will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror."); United States v. Acevedo, 755 F.2d 203, 206 (1st Cir. 1985) (citing cases).  To warrant detention, the United States must establish the risk of obstruction of justice also by a preponderance of the evidence.  United States v. Mehanna, 669 F. Supp. 2d 160, 164 (D. Mass. 2009); but see Acevedo, 755 F.2d at 208-09 (applying a "clear and convincing" standard).  By its plain terms, section 3142(g) does not include obstruction of justice. In determining whether evidence supports release or detention, courts have nevertheless relied on the record created by an analysis of the 3142(g) factors, as well as historical evidence of obstructive conduct.  See Acevedo, 755 F.2d at 208-09; Mehanna, 669 F. Supp. 2d at 165-66.  I turn now to the merits of the motion.

**B.      Risk of Flight**

Applying the factors set forth in § 3142(g), I consider the Government's motion to detain on the ground of serious risk of flight.

### 1.   Nature and Circumstances of the Offense Charged

The first factor is the "nature and circumstances of the offense charged."  18 U.S.C. § 3142(g)(1).  Defendant is charged with unauthorized retention and transmission of national defense information, in violation of 18 U.S.C. § 793(b) and (d), and unauthorized removal and retention of classified documents or material, in violation of 18 U.S.C. § 1924.

While none of the charged crimes are listed in section 3142(g)(1), the nature of the offenses Defendant is alleged to have committed are serious and of grave concern to national security.  In connection with his military duties, Defendant has held a TS/SCI security clearance since 2021. The Affidavit alleges that Defendant posted classified information to a social media platform beginning around December 2022.  The postings allegedly included a TS/SCI classified document concerning the Russia-Ukraine conflict, including troop movements, on a particular date.

Furthermore, the circumstances under which Defendant is alleged to have committed the offenses demonstrate that he did so purposefully and surreptitiously.  On July 7, 2021, Defendant signed a Sensitive Compartmented Information Nondisclosure Agreement ("NDA").  [Dkt. No. 19-1].  In this NDA, Defendant confirmed that he had been advised that SCI involves or derives from intelligence sources or methods and is classified or in the process of a classification determination.  Defendant also acknowledged that he had been advised that the unauthorized disclosure, unauthorized retention, or negligent handling of SCI "could cause irreparable injury to the United States or be used to advantage by a foreign nation."  Defendant agreed that he would never divulge anything marked as SCI or that he knew to be SCI to anyone not authorized to

receive it.  Defendant also signed the 102nd ISR Group DGS-MA General Information Systems Acceptable Use Policy and User Agreement on July 15, 2021.  [Dkt. No. 19-3].  That document highlights that United States policy "requires all classified information be appropriately safeguarded to ensure the confidentiality, integrity, and availability of the information [contained in the Information Systems installed and operated at 102 IRG/ DGS-MA]," and that a security violation or compromise "could cause grave damage to national security."  Defendant agreed that he would not release, disclose, or alter information without the consent of the Data Owner or the Disclosure Officer's approval.  On July 28, 2021, Defendant signed the 102d Intelligence Wing Information Technology User Agreement.  [Dkt. No. 19-2].  In so signing, Defendant agreed that he would not "store or process classified information on any system not approved for classified processing" and would "not disclose any non-public Air Force or DoD information to unauthorized individuals."  The terms of these agreements clearly informed Defendant of the critical need for classified information to remain confidential.  In March 2022 and March 2023, Defendant completed further training in Unauthorized Disclosure of Classified Information and Controlled Unclassified Information.  [Dkt. No. 34-5].  Based on the record, there is little possibility Defendant disclosed national defense information under an innocent and mistaken belief that such a disclosure was legal and authorized.

Defendant's alleged efforts to hide his actions confirm his understanding of the illegality of his conduct.  The Affidavit alleges that when Defendant was concerned that he might be discovered transcribing text, he took the classified documents to his home and photographed them. In September 2022, Defendant was observed taking notes on classified information and was directed to cease taking notes on such information.  [Dkt. No. 34-2].  In October 2022, after Defendant asked pointed questions at a briefing, he was again instructed to cease reviewing

classified intelligence information.  [Dkt. No. 34-3].  On November 23, 2022, Defendant also allegedly confirmed on the social media platform that he was sharing classified information, when a user of that platform questioned him, "Isnt that shit classified?" and Defendant responded, "everything that ive been telling u guys up to this point has been lol."  [Dkt. No. 19-8].  Defendant further stated, "i have plausible deniability and … no one knows how to identify me[.]  [Don't worry] ive thought of that[.]"  In apparent response to having been reprimanded for taking notes on classified documents, on December 6, 2022, Defendant texted a user: "I'm breaking a ton of U[nauthorized] D[isclosure] regs…Idgaf what they say I can or can't share."[1]  [Dkt. No. 34-1, p. 4].  On April 6, 2023, another user informed Defendant on the social media platform that he thought the documents Defendant had shared had been further disseminated.  The next day, Defendant told a user on that site, "If anyone comes looking, don't tell them shit," and advised that user to tell others on the site to do the same.  He also advised the user to delete all his messages.

Hence, the allegations reflect that Defendant was aware his disclosures could harm the United States.  Defendant purposefully ignored this risk to U.S. interests and participated in a profound breach of his loyalty to the United States.  In doing so, there is reason to believe he placed at risk men and women in our armed services, civilians and soldiers in Ukraine and elsewhere, doctors and medical professionals providing humanitarian aid, and the list goes on.  Thus, the nature and circumstances of the alleged offenses support detention.  See United States v. Wen Ho Lee, 79 F. Supp. 2d 1280, 1285-86 (D.N.M. 1999) (finding that nature of offenses alleged, which included downloading confidential restricted data relating to nuclear weapons in violation of 18 U.S.C. § 793, were quite serious and of grave concern to national security, and the purposefulness

---

[1]  Presumably, Idgaf is "I don't give a f**k."

Case 1:23-cr-10159-IT   Document 37   Filed 05/22/23   Page 10 of 22

of defendant's action weighed in favor of pretrial detention), aff'd by No. 00-2002, 2000 U.S. App.

LEXIS 3082 (10th Cir. Feb. 29, 2000).

### 2.      Strength of the Evidence

Next, Congress directs an assessment of the weight of the evidence.  I do so and find that

it also supports detention because the evidence against Defendant is compelling.    In order to

establish a violation of section 793(b), the government must prove the following three elements

beyond a reasonable doubt:

- First, that the defendant copied or took or made or obtained or attempted to take, make, or obtain a sketch, photograph, document or writing;
- Second, that the sketch, photograph, document or writing was related to national defense;
- Third, that the defendant acted with the intent or with reason to believe that the sketch, photograph, document or writing was to be used to the injury of the United States or used to the advantage of a foreign country.

Adapted from Sand's Modern Federal Jury Instructions—Criminal ¶ 29.02, Instruction 29-9.  In

order to establish a violation of section 793(d), the government must prove the following four

elements beyond a reasonable doubt:

- First, that the defendant had lawful (or unauthorized) possession of (or access to or control over) a sketch, photograph, document or writing;
- Second, that the sketch, photograph, document or writing was related to the national defense;
- Third, that the defendant had reason to believe that the document could be used to the injury of the United States or to the advantage of a foreign country;
- Fourth, that the defendant willfully communicated (or delivered or transmitted or caused to be communicated, delivered, or transmitted or attempted to communicate, deliver or transmit) the document to a person who was not entitled to receive it.

Adapted from Sand's Modern Federal Jury Instructions—Criminal ¶ 29.04, Instruction 29-21.  In

order to establish a violation of section 1924, the government must prove the following three

elements beyond a reasonable doubt:

- First, that the Defendant had unauthorized possession of a document(s) relating to the national defense of the United States;

- Second, the Defendant had reason to believe that the document(s) could be used to the injury of the United States or to the advantage of any foreign nation;
- Third, the Defendant willfully retained the same document(s) and failed to deliver the documents to an officer and employee of the United States who is entitled to receive them.

United States v. Davila, et al., 2005 WL 6228516 (E.D. Wash. 2005) (defendant's proposed instruction).

Here, the evidence that Defendant took information relating to national defense is compelling. Shortly after Defendant's April 13, 2023 arrest, a subject matter expert engaged by a Government agency audited the agency's Intelligence Community-wide database for all searches Defendant conducted. [Dkt. No. 19-4, ¶6]. The audit results date to February 26, 2022. [Id.]. They show that Defendant conducted "hundreds of searches on the classified network." [Id., ¶7]. Many subjects related to the Russia-Ukraine conflict; others related to Ruby Ridge and domestic mass shootings, such as at Mandalay Bay and Uvalde. [Id., ¶¶7-8]. An audit revealed that Defendant accessed hundreds of classified reports and documents. [Id., ¶9]. One of the posted documents described troop movements on a particular date of the Russia-Ukraine conflict and was based on classified sources and methods. [Dkt. No. 3-1, ¶17].

Equally compelling is the evidence that Defendant is the person who unlawfully copied and transmitted national defense and other classified information onto a social media platform for consumption by unauthorized individuals. One such individual, identified in the Affidavit as "User 1," told FBI agents that Defendant began posting what appeared to be classified information, and later photographs of official Government documents containing what appeared to be classified markings on a server within the social media platform, and that the Defendant was the administrator of the server. [Id., ¶¶15-16]. User 1 told the FBI that he communicated with the individual posting this information by voice and chat applications. [Id., ¶18]. User 1 identified

the individual as a clean-cut, white male, between 21 and 30, named "Jack," apparently living in Massachusetts and who claimed to be a member of USANG.  [Id., ¶19].  And User 1 identified an RMV photograph of Defendant as the individual posting classified and national defense information.  [Id., ¶22].  Not only is User 1's report consistent with the above-described audit results, it is consistent with business records of the social media platform on which the server operated.  These billing records reflect that the name associated with the individual posting classified and national defense information is the administrator of the server and is named Jack Teixeira.  [Id., ¶21].  The billing address is Defendant's residence in North Dighton.  [Id.].  Lastly, other members of the USANG witnessed Defendant accessing and copying classified intelligence information in the fall of 2022 and winter of 2023.  [Dkt. Nos. 34-2 through 34-4].

The United States must also prove that Defendant knew or had reason to believe that the posted information could be used to the injury of the United States or the advantage of a foreign nation.  The evidence leaves little doubt as to Defendant's state of mind.  When Defendant received TS/SCI clearance in July 2021, he received security indoctrination concerning the nature and protection of such information, and signed the NDA on July 7, 2021, memorializing that he was read into security procedure.  [Dkt. No. 19-1, ¶2].  Not even six months before Defendant began searching classified databases, he expressly acknowledged that:

> the unauthorized disclosure, unauthorized retention, or negligent handling of SCI by me could cause irreparable harm to the United States or be used to advantage by a foreign nation.
> …
> that SCI involves or derives from Intelligence sources or methods and is classified … under the standards of Executive Order 13526.
> …
> that any unauthorized disclosure of SCI by me may constitute violations of … Section[] 793.
> …

that Defendant had read the Nondisclosure Agreement carefully, that his questions had been answered to his satisfaction, and that Section 793 of the United States Code, among others, had been made available to him.

[Dkt. No. 19-1, ¶¶1, 3, 6, 11].  Under Executive Order 13526, the unauthorized disclosure of material classified at the "TOP SECRET" level ("TS"), by definition, "reasonably could be expected to cause exceptionally grave damage to the national security" of the United States.  Exec. Order 13526 § 1.2(a)(1), 75 Fed. Reg. 707, 707–08 (Jan. 5, 2010).  The unauthorized disclosure of information classified at the "SECRET" level ("S"), by definition, "reasonably could be expected to cause serious damage to the national security" of the United States.  Exec. Order 13526 § 1.2(a)(2).  The unauthorized disclosure of information classified at the "CONFIDENTIAL" level ("C"), by definition, "reasonably could be expected to cause damage to the national security" of the United States.  Exec. Order 13526 § 1.2(a)(3).  In sum, the record strongly shows that Defendant had reason to believe the information could and would be used to the injury of the United States.  [Dkt. No. 3-1, ¶8].

In addition, Defendant's own words reveal his intent and state of mind.  For example, on November 23, 2022, Defendant texted a user who asked whether the information Defendant was posting was classified: "everything that i[']ve been telling you guys up to this point has been lol." [Dkt. No. 19-8, p. 4].  This prompted the user to respond, you really trust everyone here then, and Defendant to reply, "I have plausible deniability and non[e] of them know[s] anything."  [Id.].  On December 6, 2022, Defendant texted a user: "I'm breaking a ton of U[nauthorized] D[isclosure] regs…Idgaf what they say I can or can't share."  [Dkt. No. 34-1, p. 4].  Similarly, Defendant confided to User 1 that he began photographing Government documents to avoid being discovered.

In the context of the foregoing evidence, Defendant's own actions are also inculpatory. When the leak of classified and national defense information began to surface publicly, Defendant

got a new cellphone, telling another Airman that his old phone flew out the window of his truck and was crushed by a tractor trailer. [Dkt. No. 19-4, ¶11]. During a post arrest search at Defendant's residence, agents recovered from a dumpster a tablet, laptop, and Xbox gaming console. [Dkt. No. 19, p. 7]. All three devices had been physically smashed. [Id.]. Defendant directed a user not to tell agents anything if the user were questioned, to convey this same message to other users, and Defendant tried to engineer the destruction of postings.

I reject Defendant's argument that the weight of the evidence is the least important factor in the release-detention calculus. Nowhere in the Bail Reform Act does Congress legislate on the relative weight a court should give each of the section 3142(g) factors. See United States v. Zhang, 55 F.4th 141, 149 (2d Cir. 2022). I also reject Defendant's related argument that an assessment of the weight of the evidence is in tension with the presumption of innocence. [Hr. Tr. p. 41]. Congress directed the Court to consider the weight of the evidence in determining release or detention; in doing so, Congress expressly noted that "[n]othing in this section shall be construed as modifying or limiting the presumption of innocence." 18 U.S.C. § 3142(j). Indeed, the inquiry into the weight of the evidence is very different than the presumption of innocence. United States v. Kent, 496 F. Supp. 3d 500, 505 (D.D.C. 2020). "Judges…can both presume innocence and assess how strong, or weak (or even potentially inadmissible) evidence is to guilt or innocence." Id. (citation omitted). By analogy, Chief Justice Roberts explained in a dissent that while an indictment reflects a grand jury finding of evidence that a defendant committed a crime, and while such defendant is entitled to a detention hearing, "no one would say that the district court encroached on the grand jury's role if the court determined that it would not authorize pretrial detention because of the weakness of the prosecution's case." Kaley v. United States, 571 U.S. 320, 349 (2014). On the other hand, if Defendant were correct, the presumption of innocence

would eviscerate the Bail Reform Act and no one arrested, regardless of the charge, evidence, danger, or risk of flight could ever be held until a guilty verdict or plea. Rather, the strength (or weakness) of the evidence is squarely relevant to the question of release or detention. A weak case may offer little incentive to flee, and a compelling case may leave a defendant feeling desperate and without options, driving the defendant to flee, destroy evidence, or take other measures to avoid the likelihood of jail. Kent, 496 F. Supp. 3d at 504; see also Zhang, 55 F.4th at 151 ("It stands to reason that the more strongly the evidence indicated that the defendant committed the murder, the more likely he poses a danger to the community if released on conditions."). So I consider this factor on par with the other Section 3142(g) factors and find it supports detention.

### 3. Defendant's History and Characteristics

Next, I am required to consider Defendant's history and characteristics, such as his physical and mental condition, family and community ties, past conduct, criminal history, and history relating to drug or alcohol abuse, and whether Defendant was on probation, parole or pretrial release. See 18 U.S.C. §§ 3142(g)(3)(A), (B). Nearly all of these factors support release. Defendant was not on probation or parole; indeed, he has no criminal history (and hence no history of failing to appear in court). He was born and raised in Massachusetts, graduated from a Massachusetts high school, resided with his mother and stepfather in North Dighton, and was employed by USANG on Cape Cod. At least until his arrest, Defendant had a promising career in the military. Defendant does not drink alcohol and there is no evidence of drug use or abuse.

Defendant's family ties are remarkable. In my experience, defendants often have no family and friends to support them, or even attend court. Defendant, on the other hand, comes from a supportive family. His mother and father, even after their amicable divorce, were active in Defendant's life, and their positive influence is perhaps reflected in Defendant's decision to follow

15

his stepfather's path in the military.  His parents have been present in court for every hearing; his father testified regarding his willingness to serve as a third-party custodian; and his parents have even offered to pledge their separate homes as security for Defendant's appearance in Court.  This is an unusual and compelling reason to release Defendant on conditions.

There are two wrinkles in this pro-release assessment.  First is Defendant's fascination with guns and their use in mass shootings.  Defendant quite rightly points out that while some people collect coins, or stamps, or enjoy an interest in cars, Defendant's interest is guns.  [Hg. Tr. p.45].  However, in my view, there is an unhealthy component to Defendant's hobby.  When Defendant was 16, he was suspended from high school for remarks he made.  Defendant dismisses them as innocent comments on a video game, but witnesses dispute Defendant's explanation and, as the sealed exhibit shows, go further.  In addition, as discussed below, Defendant's text messages suggest planning for use of guns against unknown targets.  Lastly, a focus of Defendant's searches across the classified network has been domestic mass shootings.  There is not enough here to significantly change the calculus; no evidence Defendant acted on anything he may have said, but Defendant's interest in guns includes an unhealthy interest in their use in domestic mass shootings.

Second is Defendant's lack of honor and integrity.  The success of release on bail depends on a defendant honoring his word.  United States v. Tortora, 922 F.2d 880, 887-88 (1st Cir. 1990) (the "Achilles heel" in release conditions set for alleged member of Patriarca crime family is that they depend on the defendant's "good faith.").  Defendant's history shows reason to seriously question his commitment to honoring conditions of release.  On November 15, 2020, after he had completed Basic Training and, according to Defendant, after having received TS clearance, Defendant wrote a letter in support of his re-application for a firearms license.  [Dkt. No. 19-5].  A

16

2018 application was denied on the basis of the words he spoke in high school that caused his

suspension.  [Id., p. 2].  In reapplying, Defendant wrote:

> With wearing the uniform and being a representative/ambassador of the United States Air
> Force, and now having a Top Secret clearance, I now represent much more than myself
> and need to watch what I say and do both in public and in private, as it affects more than
> just myself….I uphold and apply in my personal life as well as my military career the three
> Air Force core values, Integrity First, Service Before Self, and Excellence in All We Do.
> …
> I will be required to show that I can be a responsible and upstanding person in order to
> maintain and keep my Top Secret clearance, and that I am to be held responsible for
> anything that I do or say.

[Id.].  Yet the Government's audit shows that just 15 months later, Defendant began accessing

TS/SCI and national defense information, and thereafter disseminating this information for

consumption by individuals who were not authorized to receive it.  [Dkt. No. 19-4, ¶6].  As argued

by the United States, Defendant's about-face from what he wrote—his recognition that his conduct

affects not only himself, and acceptance that he is responsible for anything he may do or say—

undermines faith that Defendant will honor a commitment to abide by conditions of release.

Defendant seems poised to say whatever suits his advantage.

Of the same nature is the stark contrast between the NDA Defendant signed in July 2021

in which he acknowledged how damaging disclosure of SCI could be and his conduct.  Within

seven months of signing the NDA, Defendant was unlawfully accessing confidential national

security information, and within some 16 months casually, if not cavalierly, posting it on a server.

How does one credit the word or signature of this Defendant?

One may argue that Defendant would not jeopardize the security of his mother and father

who are prepared to pledge their homes.  Fair enough.  But in posting national security information

onto a server and having no idea with whom and where it may be shared—bear in mind User 1 re-

posted a TS document the day after Defendant posted it on the server—has not Defendant put at risk others, including his mother and father?

Finally, from all the actions Defendant took after the leak surfaced—physically destroying devices, getting a new phone, telling a server participant to say nothing, concocting a plan for destroying posts—is the absence of remorse, of regret, of "Integrity First."  Rather, Defendant's actions smack of "every man for himself."  It is true that Defendant did not flee when his identity as the leak suspect surfaced, and I accept Defendant's proffer that Defendant obeyed his parents' directive to come home.  However, I discount that in light of the larger picture of obstruction.

I assume that Defendant's history and background, especially the good family he is fortunate to have, drives Pretrial Services' recommendation for release on conditions.  Pretrial Services is not wrong, but respectfully, their assessment is incomplete.  On balance, Defendant's history and characteristics support detention.

### 4.  Nature and Seriousness of Danger Posed by Release

The parties agree that the Court is without authority to order Defendant's detention on the basis of danger to the safety of another person or to the community.  See United States v. Ploof, 851 F.2d 7, 11 (1st Cir. 1988).  However, Congress has directed courts in determining whether a defendant poses a serious risk of flight to consider "the nature and seriousness of the danger to any person or the community that would be posed by…release."  18 U.S.C. §3142(g)(4).  This last factor also supports detention.

First, I find that Defendant's release threatens U.S. national security.  With full appreciation for the sensitivity of the information to which he was given access, and the damage disclosure could do, Defendant accessed and transmitted TS/SCI and classified national security information which "reasonably could be expected to cause exceptionally grave damage to the national security"

of the United States.  The risk of future disclosures is intolerable: it could jeopardize the safety of soldiers, citizens, and allies of the United States.  Moreover, Defendant's knowledge of TS/SCI does not end with termination of his TS/SCI access.  He transcribed, photographed, and discussed TS/SCI and, at a minimum, retains recall of such information.  See United States v. Madrigal, No. 3:22-cr-19, 2023 WL 2823504, at *11 (W.D. Va. April 7, 2023) (noting that the threat of harm the defendant posed to the United States remained even though defendant no longer had access to the same government systems as he did while serving in the military).

Defendant dismisses this concern as "speculat[ive]" and "exaggerated."  [Dkt. No. 20, pp. 1, 7].  I disagree.  Given the publicity this prosecution has received, there is no speculation in recognizing that foreign nations are aware: Defendant accessed and transmitted to unauthorized users TS/CSI; Defendant betrayed his trust to the United States; Defendant faces a long jail sentence and disgrace.  Separately, consider the efforts of certain foreign governments to hack into U.S. computers and infiltrate U.S. research labs.  Given this landscape, an overture to Defendant, were he released, hardly seems implausible, and a willingness to listen by someone in Defendant's difficult circumstances poses an unacceptable threat to U.S. national security.  See United States v. Mallory, 268 F. Supp. 3d 854, 866 (E.D. Va. 2017) ("Defendants accused of espionage also generally pose a special danger given these defendants often possess sensitive information related to national defense that if disclosed could not only cost the lives of individual agents, soldiers, officers and diplomats stationed abroad, but in a very real sense could cost the lives of American citizens here at home.  In these circumstances, courts are not required to fashion conditions that would erect a virtual prison around the defendant.").  And in this case, I weigh a text Defendant sent less than a month before his arrest: "I've decided to stop with the updates….If you guys do want happenings that pertain to your country or events or politics or whatever you can DM me and

19

I can tell you what I have." [Dkt. No. 19-8, p. 5]. A fair reading of Defendant's words is an offer

to provide foreigners classified information.

Second, I cannot dismiss a concern for the safety of the immediate community into which

Defendant has proposed he be released. Defendant sent more than 40,000 messages between

November 1, 2022 and April 7, 2023. Even the small sample offered as an exhibit raises concerns

about Defendant's penchant for violence.

> November 23, 2022:
> I hope isis goes through with their attack plan and creates a massacre at the World Cup.
> If I had my way I'd kill a fuck ton of people....Seriously, I would be forcibly culling the
> weak minded.
>
> February 4, 2023:
> I've been tempted to buy [a Dodge Caravan] and make it an assassination van.
> Set up an ar and sniper blind.
>
> February 10, 2023:
> Defendant:  I wanted a can on an ar to shoot out of an suv accurately
> User: Unless you have the whole passenger area converted for gun activities.  If so 12.5 to
> 14.5 would make sense.
> Defendant: w/can?
> User: Yeah.  Cans are important bc it makes it sorta hard to tell where its coming from or
> what it was.
> …
> Defendant: well for this it would be a crowded urban or suburban environment.
> So it's essential.
> User:  Would you use it to go through a crowd or nah?
> Defendant: the car or the gun?
> User:  Gun
> Defendant:  no.  car is parked
> Window down
> Stationary driver
> User:  alr
> Defendant: target on a sidewalk or porch.

[Dkt. No. 19-8, pp. 2-3]. This small sample of texts goes beyond a healthy interest in guns. The

first text reflects hostility, even hatred, and the last reflects the specifics of planning. Whether or

not Defendant would carry out a shooting, it is clear in the texts that he has thought about a specific

target or category of targets who would be on a sidewalk or porch.  Equally concerning is Defendant's focus in his unauthorized searches on domestic mass shootings.  The cumulative impact of this record is unsettling.

I balance this against the point Defendant makes that when arrest was imminent, Defendant did not flee or resist.  Certainly, his conduct at that time shows lawful compliance and even acceptance.  But on balance, Defendant's conduct at arrest is an isolated instance of compliance, when compared with the breach of his loyalty, dissemination of TS/SCI to unauthorized users, obstructive conduct, and fundamental lack of integrity.  I find that that the nature and seriousness of the danger posed by Defendant's release supports detention.

## C.     Serious Risk of Obstruction of Justice

Based on the foregoing analysis, I also find that the United States has proved by a preponderance of the evidence that there is no condition or combination of conditions that will address the serious risk that Defendant will obstruct justice.  As discussed above, Defendant engaged in obstructive behavior as publicity surrounding the leak of classified information surfaced.  He destroyed his cellphone and replaced it with a new phone within weeks of his arrest.  He destroyed a tablet, laptop and Xbox gaming console, discovered by agents in a dumpster at his home.  He instructed a user not to cooperate with questioning by law enforcement and to convey this same directive to other users.  And he tried to engineer a way to destroy postings.

As evidenced by Defendant's military transcript, he has not fewer than a half dozen courses in network and computer systems training.  Defendant was the administrator of the server on which he posted TS/SCI.  On release, Pretrial Services' ability to meaningfully monitor Defendant's access to the internet would be no match for Defendant's training and experience, and the

21

ubiquitous availability of the internet.  I find that no conditions would adequately ensure Defendant would not seek to destroy evidence, encourage others to do so, and otherwise obstruct justice.

## III.    CONCLUSION

I find that the United States has proved by a preponderance of the evidence that no condition or combination of conditions will reasonably address the serious risk of flight and obstruction of justice posed by Defendant's release on conditions.  Accordingly, the motion to detain is granted.

**Defendant is advised of his right under section 3145(b) to seek review of this Order.**


/ s / David H. Hennessy
David H. Hennessy
United States Magistrate Judge