**UNITED STATES DISTRICT COURT**

**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 23-CR-10159 |
| | ) | |
| JACK DOUGLAS TEIXEIRA | ) | |

<u>**DEFENDANT JACK DOUGLAS TEIXEIRA'S**</u>
<u>**DETENTION APPEAL**</u>

**Exhibit 2**

**Detention Hearing Transcript**

1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3

4    United States of America,     )
                    Plaintiff,     )
5                                  )
                                   )
6    vs.                           )   Case No. 23-mj-04293-DHH
                                   )
7                                  )
     Jack Douglas Teixeira,        )
8                   Defendant.     )

9

10   BEFORE:  Magistrate Judge David H. Hennessy

11

12                      Detention Hearing

13

14

15                           United States District Court
                             Courtroom No. 2
16                           595 Main Street
                             Worcester, Massachusetts
17                           April 27, 2023

18

19

20

21

22

23                 Marianne Kusa-Ryll, RDR, CRR
                      Official Court Reporter
                   United States District Court
24                  595 Main Street, Room 514A
                     Worcester, MA 01608-2093
25              508-929-3399 justicehill@aol.com
                Mechanical Steno - Transcript by Computer

DEFENDANT
EXHIBIT

**2**

```
1     APPEARANCES:

2     United States Attorney's Office
      Nadine Pellegrini, Assistant U.S. Attorney
3     Jared C. Dolan, Assistant United States Attorney
      1 Courthouse Way
4     Suite 9200
      Boston, Massachusetts 02210
5     on behalf of the Government

6     DOJ-Nsd
      United States Department of Justice
7     Christina A. Clark
      950 Pennsylvania Ave. NW
8     Washington, D.C. 20530
      On behalf of the Government

9
      Federal Public Defender Office
10    Brendan O. Kelley, Assistant Federal Public Defender
      Gene Allen Franco, Assistant Federal Public Defender
11    Joshua Robert Hanye, Assistant Federal Public Defender
      District of Massachusetts
12    51 Sleeper Street, 5th Floor
      Boston, Massachusetts  02210
13    on behalf of the Defendant

14    Also present:

15    Kaileen Paiva, U.S. Probation Officer

16

17

18

19

20

21

22

23

24

25
```

3

1                       <u>I N D E X</u>

2

    Examination of: ___ _____    Page

3
    Jack Michael Teixeira

4
    (By the Court)                                            8
5   (By Mr. Kelley)                                          11
    (By Ms. Pellegrini)                                      16
6   (By Mr. Kelley                                           17

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         P R O C E E D I N G S

2                 (The following proceedings were held in open court

3        before the Honorable David H. Hennessy, United States

4        Magistrate Judge, United States District Court, District of

5        Massachusetts, at the Donohue Federal Building & United States

6        Courthouse, 595 Main Street, Worcester, Massachusetts, on

7        April 27, 2023.)

8                 THE CLERK:  All rise.

9                 The U.S. District Court for the District of

10       Massachusetts is now in session, the Honorable David Hennessy

11       presiding.

12                You may be seated.

13                Today is April 27, 2023.  We're on the record in the

14       matter of United States versus Jack Douglas Teixeira.  It's

15       docket 23-mj-4293.

16                Will counsel and probation please identify themselves

17       for the record.

18                MS. PELLEGRINI:  Good afternoon, your Honor.  Nadine

19       Pellegrini for the United States.

20                THE COURT:  Good afternoon, Ms. Pellegrini.

21                MR. DOLAN:  Good afternoon, your Honor.  Jared Dolan

22       on behalf of the United States.

23                THE COURT:  Good afternoon, Mr. Dolan.

24                MS. CLARK:  Good afternoon, your Honor.  Christina

25       Clark on behalf of the United States.

1              THE COURT:  Good afternoon, Ms. Clark.

2              MR. KELLEY:  Good afternoon, your Honor.  Brendan

3     Kelley for Mr. Teixeira, who's seated to my right.

4              THE COURT:  Good afternoon Mr. Kelley.

5              MR. FRANCO:  Good afternoon, your Honor.  Allen Franco

6     for Mr. Teixeira.

7              THE COURT:  Good afternoon, Mr. Franco.

8              MR. HANYE:  Josh Hanye also for Mr. Teixeira.  Good

9     afternoon, your Honor.

10             THE COURT:  And good afternoon -- good afternoon,

11    Mr. Hanye.

12             PROBATION OFFICER PAIVA:  Good afternoon, your Honor.

13    Kailee Paiva for Probation.

14             THE COURT:  And good afternoon, Ms. Paiva.

15             Okay.  We -- this is the detention hearing in this

16    matter.  Just to go over what I've received, I received the

17    Pretrial Services report dated April 18, which recommends the

18    defendant's release on conditions.

19             Ms. Paiva, just one question, and I also received from

20    you this morning an email about location monitoring.

21             Is Probation also recommending in addition to the four

22    conditions here that the defendant be on location monitoring?

23             PROBATION OFFICER PAIVA:  Probation is not

24    recommending location monitoring at this time, but provided

25    that language in the event the Court needed it.

1          THE COURT:  Okay.  Thank you.

2          In addition, I received this morning the government's

3    supplemental motion in support of pretrial detention with

4    exhibits attached; the defendant's memorandum in support of

5    release on behalf of Mr. Teixeira, also with attachments; and

6    finally, under seal from the government, a police report.

7          Is that everything as far as you know, Ms. Pellegrini?

8          MS. PELLEGRINI:  That is, your Honor.

9          THE COURT:  Okay.  Mr. Kelley?

10         MR. KELLEY:  It is, Judge.  As we walked in this

11   morning, I do have a letter that addresses the firearms that

12   were at Mr. Teixeira's father's residence --

13         THE COURT:  Okay.

14         MR. KELLEY:  -- that have been removed, and I can

15   submit that to the Court as well.

16         THE COURT:  That's fine.  Sure.  Thank you.

17         MR. KELLEY:  And we showed this to the government.

18         (Document handed to the Court.)

19         THE COURT:  Okay.  Ms. Pellegrini, does the government

20   want to offer testimony?

21         MS. PELLEGRINI:  Not testimony, your Honor.  I would

22   like to speak the Court though.

23         THE COURT:  On argument?

24         MS. PELLEGRINI:  Yes.

25         THE COURT:  Okay.  And, Mr. Kelley, any evidence you

1    want to present or proffer?

2            MR. KELLEY:  No, no evidence, Judge.  Mr. Teixeira's

3    father is here though, if the Court does want to inquire of him

4    as a third-party custodian who's present in the court.

5            THE COURT:  You know, I -- I think it makes sense to

6    do that.  If we could have Mr. Teixeira's father come forward.

7            THE CLERK:  Could you please raise your right hand.

8            Do you solemnly swear that the testimony you are about

9    to give will be the truth, the whole truth, and nothing but the

10   truth, so help you God?

11           THE WITNESS:  Yes, I do.

12           THE CLERK:  Could you please state and spell your full

13   name.

14           THE WITNESS:  Jack Michael Teixeira.  J-A-C-K

15   M-I-C-H-A-E-L T-E-I-X-E-I-R-A.

16                               EXAMINATION

17   BY THE COURT:

18   Q.    Mr. Teixeira, what is your relationship to the defendant?

19   A.    He's my son.

20   Q.    And without disclosing the address, do you currently live

21   in North Dighton?

22   A.    Yes, your Honor.

23   Q.    I understand that you have spoken with Probation about the

24   possibility of serving -- of serving as a third-party

25   custodian; is that correct?

1    A.   Yes, your Honor.

2    Q.   And do you understand those responsibilities?

3    A.   I believe I do.

4    Q.   All right.  For instance, it was reported in the press

5    last week, perhaps a week before that, after the proceedings

6    you had called out to your son understandably that you love

7    him?

8    A.   Yes, sir, your Honor.

9    Q.   Do you understand that if there were a violation of any

10   conditions, and I'm not saying that I'm going to release the

11   defendant, your son, but if I were going to do so, if there

12   were a violation of any of those conditions, you would have to

13   report that.

14   A.   Yes, your Honor.

15   Q.   If your son violated conditions, there's a very good

16   chance, again if he were released, there's a very good chance

17   that I would revoke his detention, and he would be returned to

18   custody.

19        Knowing that, are you comfortable reporting to the

20   Probation Department any violation of conditions that may be

21   imposed in this case?

22   A.   Yes, your Honor.  My son's well aware of the fact that if

23   he is released, if he does anything against his probation I

24   have told him that he will be reported -- I will report it to

25   his probation officer or anyone else in authority that needs to

1    know.

2    Q.    Okay.  Does anyone else live with you at your residence in

3    North Dighton?

4    A.    No, your Honor.

5    Q.    And you're currently employed; is that correct?

6    A.    Yes, your Honor.

7    Q.    What hours do you work during the week or -- I guess more

8    importantly, what hours are you not at home during the week in

9    connection with work?

10   A.    Could you repeat that again.

11   Q.    Sure.  What hours -- I guess whether it's work or anything

12   else, what hours are you not at home during the week?

13   A.    The only time I'm not home during the week is when I'm

14   working.

15   Q.    Okay.  And what hours do you work?

16   A.    It's generally 6:30 to 4:30.

17   Q.    And is that Monday through Friday?

18   A.    Yes, your Honor.

19   Q.    And so there would be no one else at the residence during

20   that time or at another time other than yourself?

21   A.    No, your Honor.

22             THE COURT:  Okay.  Ms. Pellegrini, do you have any

23   questions?

24             MS. PELLEGRINI:  I do not, your Honor.

25             THE COURT:  Okay.  Mr. Kelley.

```
1              MR. KELLEY:  Just briefly.
2                            EXAMINATION
3    BY MR. KELLEY:
4    Q.   Mr. Teixeira, your house has Ring doorbells at it?
5    A.   Yes, sir.
6    Q.   And is that at every exit and entrance to the house?
7    A.   Yes, sir.
8    Q.   And does that alert you to anyone coming or going from the
9    house when you're not there?
10   A.   Yes, sir.
11   Q.   How does it do that?
12   A.   Through text message.
13   Q.   Okay.  You receive a message on your phone?
14   A.   Yes.
15   Q.   Do you receive the video?
16   A.   Yes, sir.
17   Q.   Do you receive the audio?
18   A.   Yes, sir.
19   Q.   Okay.  And you'd be able to monitor that when you're not
20   at the house; is that right?
21   A.   Yes, sir.
22   Q.   Okay.  Is there any other cameras inside the house?
23   A.   There's an additional one in the living room.
24   Q.   Okay.  How long have you had that camera for?
25   A.   A long time.  Eight, ten years.
```

1    Q.   Why do you have a camera in the living room?

2    A.   It was used to monitor Jack when he would come home from

3    school so that I would be able to see when he came home and

4    when he left and be sure that he was safe and nothing would

5    happen.

6    Q.   Okay.  You have been employed in your current location for

7    how long?

8    A.   Nineteen years.

9    Q.   Previous to that, how were you employed?

10   A.   Previous to that, I was -- worked as a salesman for a few

11   different companies.

12   Q.   Okay.  And previous to that?

13   A.   I was a corrections officer.

14   Q.   Where at?

15   A.   Bridgewater State Hospital.

16   Q.   Okay.  And how long were you a corrections officer at

17   Bridgewater State Hospital?

18   A.   I was employed for six years.

19   Q.   Okay.  Now --

20            THE COURT:  Sorry, could you repeat that.

21            THE WITNESS:  I was employed for six years.

22            THE COURT:  Thank you.

23   BY MR. KELLEY:

24   Q.   Now, in your current occupation, do you have the ability

25   to work from home when allowed from your employment?

1  A.   Yes, I do.

2  Q.   Okay.  How frequently are you able to do that?

3  A.   I should be able to do it as often as necessary.

4  Q.   Okay.

5       MR. KELLEY:  I don't have any -- actually, let me ask

6  this.

7  BY MR. KELLEY:

8  Q.   Inside your home, do you have any computers or other

9  devices currently?

10 A.   Currently, I don't have any computers.  I do have a tablet

11 and a cell phone.

12 Q.   Okay.  And you're able to password protect those?

13 A.   Yes, they are password protected.

14 Q.   Okay.  When you leave the residence you'd be able to take

15 those with you?

16 A.   Yes.

17 Q.   You also have a television?

18 A.   Yes.

19 Q.   Okay.  And does that connect to the internet?

20 A.   Yes, it does.

21 Q.   Okay.  Are you able to prevent it from connecting to the

22 internet?

23 A.   Yes, I am.

24 Q.   How would you be able to do that?

25 A.   I have software that would prevent any access to the

1    router incoming/outgoing.

2    Q.    Okay.  If the Court required it would you be able to

3    remove that TV?

4    A.    Yes, sir.

5    Q.    And you'd be willing to do that?

6    A.    Yes, sir.

7    Q.    Okay.  Without the television connecting to the internet,

8    is there any ability for the TV to be watched?

9          Let me ask you this:  Do you have a broadcast signal?

10   A.    I have an over the air.

11   Q.    Okay.  Over-the-air signal?

12   A.    Which is just receiving only.

13   Q.    Okay.  The residence that you're at, how long have you

14   lived at that residence?

15   A.    Twenty-eight years, I think.

16   Q.    And I may have not asked you this, but where were you born

17   at?

18   A.    I was born in Taunton, Massachusetts.

19   Q.    Okay.  So you've lived in this area your whole life?

20   A.    Yes.

21   Q.    Do you have family in the area as well?

22   A.    Yes, I do.

23   Q.    Okay.  And you previously owned firearms --

24   A.    Yes.

25   Q.    -- is that right, or you do own?

1    A.    I do own.

2    Q.    You no longer have them in your residence, right?

3    A.    I do not.

4    Q.    And you would not permit Mr. Teixeira any access to any

5    firearm whatsoever --

6    A.    Never.

7    Q.    -- right?

8          Has your house been searched recently by the FBI --

9    A.    Yes, it has.

10   Q.    -- or law enforcement?

11         Okay.  Approximately when did that occur?

12   A.    That occurred Friday morning on the 14th around 1:00 a.m.

13   Q.    Okay.  And how long was that search to your recollection?

14   A.    I believe four hours, three to four hours.

15   Q.    Okay.  And after they left, you were able to go through

16   your house?

17   A.    Yes.

18   Q.    It appeared to be thoroughly searched through --

19   A.    Yes.

20   Q.    -- right?

21         MR. KELLEY:  Okay.  Nothing further, your Honor.

22         THE COURT:  Okay.

23         MS. PELLEGRINI:  Your Honor, I do have a few questions

24   that --

25         THE COURT:  Sure.

1        MS. PELLEGRINI:  -- have been raised by the

2   questioning.

3                          EXAMINATION

4   BY MS. PELLEGRINI:

5   Q.    Where is your employment?

6   A.    It's in Sudbury, Massachusetts.

7   Q.    And how far is that from your home?

8   A.    It's about an hour and ten -- hour and ten minutes.

9   Q.    So if you received a signal, it would be an hour and ten

10  minutes before you get back home?

11  A.    If I had to get back home, yes.

12  Q.    And with respect to the location of your home, are there

13  other houses nearby?

14  A.    Yes, there is.

15  Q.    Do other family members live close by?

16  A.    In the same neighborhood?

17  Q.    Same neighborhood, within walking distance?

18  A.    Five minutes.

19  Q.    A five-minute walk?

20  A.    I'm not sure.  I believe by car it would be five minutes.

21  Q.    And other -- other than those five-minute walks, is there

22  anybody else who is closer with a home or business?

23  A.    No.

24        MS. PELLEGRINI:  I have nothing further.

25        THE COURT:  Okay.

1                        EXAMINATION

2  BY MR. KELLEY:

3  Q.   If you received an alert on the road that something was

4  going on, what would you do?

5  A.   As far -- depends on what was going on.  I mean, if there

6  was anything to do with Jack exiting the house or someone

7  coming in the house, I would either call him or call whoever it

8  was necessary that I'm instructed to call.

9          MR. KELLEY:  Okay.  Thank you.

10        THE COURT:  Thank you.  You can step down.

11        THE WITNESS:  Thank you.

12        THE COURT:  Mr. Kelley, anything else you want to

13  present?

14        MR. KELLEY:  No, your Honor.  Thank you.

15        THE COURT:  Okay.  One second.

16        (The Court conferred with the clerk.)

17        THE COURT:  All right.  Ms. Pellegrini, I'll hear you.

18        MS. PELLEGRINI:  Thank you, your Honor.

19        Your Honor, as previously set forth in the

20  government's oral motion and its supplemental written motion,

21  the government has moved for a detention hearing asking that

22  the defendant be detained on two grounds.

23        One, that there's a serious risk of flight under

24  18 USC 3142(f)(2)(A); and two, that there's an equally serious

25  risk of obstruction of justice under 3142(f)(2)(B).

1          Since the time of requesting the hearing and its being

2     held today, relatively short that that time has been, the

3     government has continued its investigation, and everything that

4     the government has that has been provided to the Court and

5     counsel today, including the items in the binder,

6     overwhelmingly supports the request.

7          To be clear, we are not asking the Court as the

8     defense suggests, to move under a dangerousness ground,

9     separate and apart from the 31 (f)(2)(A) factors.

10          We are, however, reading the factors under subsection

11     (g) which directs the Court should it find one or both of the

12     grounds proffered to exist to highlight why, particularly in

13     the context of obstruction, that the Court should consider the

14     danger that this defendant poses to the community.

15          One of the other factors that section (g) notes is the

16     nature and character of the defendant, and I'd like to speak to

17     that today.

18          Before I do, let me just say, your Honor, that the

19     grounds that we've proffered under or will proffer under are

20     separate and distinct from each other, the burdens of proof

21     differ; but in this particular case, there are fundamental

22     elements, an overlap of behavior and proof that support both

23     arguments.

24          Now, I'm not going to repeat everything that the

25     government submitted in its memo, but there are some aspects

1    that I would like to highlight and underscore for the Court.

2         The information we have provided your Honor is not

3    speculation.  It is not hyperbole, nor is it the creation of a

4    caricature.  It is based upon what we know to date, and the

5    underlying facts are not based upon my words, they're not based

6    upon the words of law enforcement, but they are directly based

7    upon the words and the actions of this defendant.

8         So as I said, and as (g) directs, it's the nature of

9    the character of the defendant, and we believe that the

10   ultimate decision that this Court has to make as to whether or

11   not there are a -- there is a condition or a combination of

12   conditions that can reasonably assure the Court that the

13   defendant will follow the rules that the Court sets down, those

14   are missing.

15        We see nothing in the defendant's past.  Now, what's

16   past may not always be prologue, but in this case, it is a very

17   good indication that this defendant will take steps to either

18   flee this jurisdiction or continue in the steps that he has

19   already taken to obstruct justice by destruction and possibly

20   by threats to others whom he dealt with during the course of

21   his conduct.

22        The defendant, based upon his past, would seem unable

23   to resist the temptation to flee in the face of serious

24   federal -- federal crimes.  He would be unable to resist the

25   enticement of a future of -- of seeking a future elsewhere that

1    holds some promise, as opposed to the one he faces now, which

2    holds very little promise, except a lengthy incarceration.

3         Certainly, he faces a future here where employment in

4    his current field would be at the very least problematic, and

5    it's hard to imagine based upon some other factors, that I will

6    highlight in a minute, that he would not seek to make himself

7    valuable to other individuals and adversaries of the United

8    States, who seek the information that he illegally obtained.

9         Jack Teixeira is no longer a small child sitting at a

10   big desk with a big computer screen.  He's also not the person

11   that he describes himself as being in a letter that he wrote to

12   a police officer when he was seeking a firearms permit.  The

13   reason we pose that document to the Court is because it shines

14   a light on the defendant's character and demonstrates that he

15   uses what he can when it's to his advantage, and he ignores it

16   when he doesn't want to use it.  So he ignores the rules, for

17   example, of the Air Force.  He's not the person he described in

18   the letter, who upholds and applies the core values of the Air

19   Force: Integrity first, service before self, and excellence in

20   all we do.

21        He cites the school suspension in 2018 claiming that

22   he has learned from that experience, and he was -- is now no

23   longer the person he was then.  And the reason the government

24   brought that up was not to highlight the nature of the school

25   suspension, troubling as that might be, but it's because it

1    shows that the defendant uses what he can to gain what he

2    wants.

3            So he tells the police officer that he has matured,

4    that he has changed, that he understands the ramifications of

5    his actions, and he cites that credo that I just mentioned of

6    the Air Force, and he does this when, in fact, it's not true.

7            There is no integrity in Mr. Teixeira's character,

8    because there can be none when there is such deceit.  There can

9    be none when there is such a profound breach of trust, and

10   there can be none when there is such willful disregard in the

11   actions of destruction and obstruction.

12           He has constantly and consistently put himself before

13   all else.  He liked touting his role.  He liked being the

14   gatekeeper.  He liked being the given of information that

15   people shouldn't have.  What he didn't like was adhering to the

16   rules.  What he didn't like was having to keep secret that

17   which he promised to do time and time again.

18           Exhibit A, your Honor, and if I may, I'm just going to

19   turn around a large board of this.  It's a little bigger, but

20   the Court has it in its binder.

21           And this is a -- it's two pages what we have called,

22   Sensitive Compartmented Information Nondisclosure Agreement.

23   You can see, your Honor, that there are 16 paragraphs where it

24   is spelled out what the defendant's obligations are and how

25   serious any breach of those obligations would be.

1          I understand in paragraph 8, he says, that all

2     information to which I may obtain access by signing this

3     agreement is now and will remain the property of the United

4     States Government unless and until determined by an appropriate

5     official or a final ruling of the Court.

6          Mr. Teixeira decided on his own to take over that

7     role, and he decided on his own to send that information out,

8     because he likes that role, and he doesn't like the rules, but

9     he'll say to you that he will follow them.  He will sign

10    anything you put in front of him, and he will promise you that

11    he will adhere, and you will seek that acknowledgment and that

12    assurance.

13         But what he seeks is opportunity, an opportunity to

14    leave this courtroom and go to a home that he has a room in and

15    has had previously, go to a neighborhood where he can walk out

16    with his skills.  He doesn't need to have his father have a

17    computer in his home for him to get out and access.  If his

18    father is an hour and 10 minutes away, he'll be long gone.

19         What else did he sign to say?

20         These restrictions are consistent with and do not

21    supersede or conflict or otherwise alter the employee

22    obligations, rights or liabilities.  That's paragraph 14, your

23    Honor.

24         In that paragraph he is advised exactly of the crime

25    with which he now is charged.  Violation of the Espionage Act

1   for illegal access and dissemination of classified and highly

2   sensitive government documents.  It's here and right below it

3   is his signature.  What could give you any confidence, your

4   Honor, that he would follow what you told him to do?

5          Many times I think, Judge, people come before you, and

6   there are people who haven't been in a situation like the

7   courtroom before or haven't even been in a situation like

8   Mr. Teixeira has been in before, where you are told you have a

9   responsibility.  It is a serious responsibility.  And by

10  signing this you agree to this, and you agree to all the

11  petitions related to your employment, every single one of them,

12  and he signed it.  So what makes anyone think that his

13  signature on a piece of paper saying I promise I won't do

14  anything to violate my conditions actually means anything?

15         In his world if he doesn't like it, he won't do it.

16         As I said, he has constantly and consistently put

17  himself before all else.  And his own words show that he likes

18  that role.

19         First, your Honor, we understand and look at the -- I

20  direct the Court's attention to attachment D, which indicates

21  that there was an audit, and in that audit Mr. Teixeira

22  conducted hundreds of searches on the classified network on a

23  number of subjects, many of which related to the Russia/Ukraine

24  conflict.  That is not only a violation of the document that is

25  before you, your Honor, but other documents, several of which

1    he -- that he had to sign in order to obtain the position that
2    he held.

3           And in addition to that, he also searched for the
4    following terms: Ruby Ridge, Las Vegas shooting, Mandalay Bay
5    shooting, Buffalo Tops shooting, and Uvalde, none of which had
6    any connection to his job at the Air Force Base.

7           But more importantly, and more disturbingly, is what
8    he said when he thought that no one would ever know.

9           We'll go back to the school incident, which as I
10   understand it from looking at the Pretrial Services report,
11   seemed to indicate that it was some type of misunderstanding,
12   and for which his father during the interview indicated he
13   didn't really recall.

14          Now, it's hard to imagine that one would forget the
15   details of finding out from the school that your son had been
16   suspended because his talk of guns and violence and racial
17   animus had so frightened other students that they reported it
18   to school staff.

19          But what's more important, your Honor, is when getting
20   back to the letter that he said to say, I'm changed, I've
21   matured, I understand the consequences of my actions.

22          So what does he say on November 23rd, 2022?  This is a
23   second page of the declaration, your Honor, If I had my way,
24   I'd kill a (expletive deleted) ton of people, because in all
25   honesty, you have to whether or not you like it.  Seriously, I

1   would be forcibly culling the weak-minded.

2          He then goes on to have a conversation where he sets

3   out what he would do if he could just have the proper rifle to

4   operate from the back of an SUV.  Well, for this it would be a

5   crowded urban or suburban environment.  So it's essential.  He

6   is asked, Would you use it to go through a crowd or nah?  He

7   asks, The car or the gun?  The other person says, Gun.  The

8   defendant replies, No.  Car is parked.  Window down.

9   Stationary or driver is -- the other person indicates all

10  right.  At least I think that's what that is, ALR.  And

11  Teixeira says, Target on a sidewalk or porch.

12          How has he changed in those years?  How has the values

13  that he claims that he incorporated as the ambassador -- an

14  ambassador of the Air Force reflected in those remarks?

15          Then there is the documents themselves.  In that same

16  document, he's asked: Isn't that shit classified?  He responds,

17  Everything that I've been telling you guys up to this point has

18  been, LOL.  It's a big joke to the defendant.

19          He says, This isn't different.  And then when

20  he -- when he's asked about whether he's trusting people in

21  that room, he says, I have plausible deniability, and none of

22  them know anything incriminating about me.  No one knows my

23  point of contact at work.  No one knows where I work.  And no

24  one knows how to identify me.  DW, which I believe is don't

25  worry.  I've thought of that.

1       This is an individual who does plan in advance, your

2   Honor, to present and position himself in the best light

3   possible.  And then he goes on to say what he's actually doing.

4   It isn't just one government agency or one part of the

5   intelligence community.  He's talking about the material that

6   he collects.  I usually split it up by agency.  He goes on,

7   I've reported stuff like this almost daily as I get to my

8   friends and have always done it in this format.  There's just

9   so much of it.  So I tailor it and I take important parts and

10  include as many details as possible.

11      He became the one-stop shop for people who wanted to

12  have access to that which they couldn't.  What he says, If you

13  guys do -- if you guys do want happenings that pertain to your

14  country or events or politics or whatever, you can DM me, and I

15  can tell you what I have, but it's always going to be a brief

16  summary.

17      And finally, your Honor, when it's closing in on him,

18  when there was a disclosure that, in fact, classified documents

19  had been leaked, Teixeira tells others, if anyone comes

20  looking, don't tell them shit.  I mean tell them not to tell

21  anyone.  Whenever you get this, try to delete all my messages

22  in civil discussions.  Especially those not in the thread.  And

23  he says, Wait, I have an idea.  Give me an invite.  Then ban me

24  and delete all messages.  The user agrees.

25      Just find stuff, Mr. Teixeira goes on, from February

1 | of 2022 in civil discussion and delete it during your free

2 | time.

3 | So, your Honor, this is not the first time that the

4 | defendant has had to acknowledge serious consequences of his

5 | actions.  He had to do so from 2018, relating to the school

6 | incident, and he to do so time and time again to obtain and to

7 | maintain his top-secret clearance.  But as we now know, that

8 | meant nothing.  That's about as worthless as that board is.

9 | Saying that he is no longer going to be able to access

10 | classified information is of cold comfort when we know,

11 | according to the audit, he accessed far more than he ever

12 | posted, and he has taken steps time and time again to thwart

13 | the government in its recovery and its mitigation of the

14 | continued leakage of that information.

15 | How do we know that?  Because of what was found at his

16 | house, a house he lived at, by the way, with his mother and his

17 | stepfather.  So what do the agents find?

18 | Among other things in his house was a smashed iPad,

19 | other items that were broken up and a box with a new phone, or

20 | for a new phone, as we later learned, and he told colleagues

21 | that the reason he needed a new phone is because his phone

22 | happened to fly out of his truck window and then conveniently

23 | was run over by a semitruck.  He has got an answer for

24 | everything, your Honor, and I have no doubt that if you asked

25 | him if he would abide by the conditions, his answer would be

1    "of course I will."

2            But I don't know how you could ever trust that answer.

3            THE COURT:  Ms. Pellegrini, the things that were found

4    in the dumpster, including the empty phone box, which residence

5    is that?  Is that the mother and stepfather?

6            MS. PELLEGRINI:  His mother and stepfather, your

7    Honor.

8            THE COURT:  Okay.

9            MS. PELLEGRINI:  And that is pictured in attachment J.

10           THE COURT:  Okay.

11           MS. PELLEGRINI:  And there are two documents in that

12   attachment showing items that were found and the condition in

13   which they were found.

14           Your Honor, I also have indicated to the Court in the

15   memo that it is important to recognize what skills the

16   defendant does have.  He, although he has graduated from high

17   school and has not yet graduated from college, he does possess

18   a background in information systems technology.  That is

19   attachment K, which lists the courses that he has taken

20   relating to, ironically, cybersecurity, information technology

21   fundamentals, computer system familiarization, advanced

22   networking, and general maintenance training.

23           It's the government's position that with that

24   background any conditions that the Court might try to fashion

25   to restrict or prohibit his access or use of information

1    technology, internet sites, or other platforms is very much

2    undercut by the background that he already possesses.

3           Your Honor, I think all of the factors that we have

4    set forth support our request for detention.  I would like to

5    address something that I only received this morning from the

6    defense at the same time that the Court did, regarding

7    the -- the parallel path, if you will, of the military.

8           The defense seems to suggest in their filing that

9    having the military is some kind of, like, secondary or

10   uberrestriction or system which would keep the actions of the

11   defendant in check; however, I spoke to a major -- I'm going to

12   get their name all wrong -- I think it's Prokscha -- this

13   morning and provided her with the defendant's filing.  She

14   advised me, your Honor, that, in fact, the -- keeping in touch,

15   if you will, with the defendant is actually only applicable for

16   when he is in pretrial detention; and even now what has been

17   happening is that the individual who has been checking in has

18   been doing so telephonically from Andrews Air Force Base and is

19   not located at Hanscom.

20          The major also further advised that Air Force

21   personnel are not permitted to enter a home and look around

22   without legal -- prior legal authority.  So the suggestion that

23   that could act as some kind of secondary barrier or catchall, I

24   think, is misplaced.

25          I also think that given the actions of his family that

1    they are not well placed to monitor this defendant's actions

2    now.

3         It has come to the government's attention that

4    information that he accessed illegally had to have been in his

5    mother and stepfather's home given pictures of documents that

6    we have recovered, and what we have seen during the search that

7    matches the location in the kitchen of that home.  So the

8    thought that they could or would or had monitored his behavior

9    in any way, I think, is also misplaced and does not support the

10   request for detention.

11        If the Court has no questions, the government's

12   proffer is complete.

13        THE COURT:  I think I do have one question before I

14   hear from Mr. Kelley.  And that is so what's the -- what's the

15   status of the -- of a military prosecution, if you know?

16        MS. PELLEGRINI:  In talking to -- actually, the person

17   I was talking to is, in fact, the prosecutor, so my

18   counterpart, if you will, in the military.  I had asked her

19   yesterday where that stands, and thus far they are

20   simply mon- -- at this point, as far as I know from that

21   individual, monitoring the situation regarding the charges in

22   this court.

23        THE COURT:  Okay.  So if the defendant were released,

24   at least based on the information you have, he would not be

25   going into some type of military pretrial custody?

1          MS. PELLEGRINI:  That was the information I received

2     from the major yesterday, because I asked that particular

3     question, and so I think it would be slightly different if, in

4     fact, there were no charges at all --

5          THE COURT:  Separate?

6          MS. PELLEGRINI:  But right now -- right, if there were

7     no charges here before this court.

8          THE COURT:  Okay.

9          MS. PELLEGRINI:  But right now they would see what the

10    situation would be.  They, like the federal government, have no

11    facility here in the District of Massachusetts to detain the

12    defendant for longer than 72 hours, so he would have to be

13    moved out of the district if they did, in fact, step in, but

14    that is not at all clear to me that that will happen.

15         THE COURT:  Okay.  Thank you.

16         MS. PELLEGRINI:  Thank you.

17         THE COURT:  Mr. Kelley.

18         MR. KELLEY:  Thank you, your Honor.

19         Jack Teixeira is 21 years old.  He lives in the only

20    community that he has known his whole life.  He has stable

21    family support.

22         We understand the interest in this case is intense.

23    Mr. Teixeira is charged with serious, though nonviolent,

24    offenses.  Even though this may be an atypical case, the Bail

25    Reform Act directs the Court to the same questions and the same

1    answers as any other case where the government moves under

2    (f)(2).  Is there currently present a serious risk of flight?

3    Is there currently present a serious risk of obstruction of the

4    process?

5           And if either of those answers is yes, only then does

6    the Court turn to the factor that the government has spent so

7    much time on, whether conditions will reasonably assure the

8    appearance of a defendant and the safety of any person or the

9    community.

10          Mr. Teixeira is entitled to release under the

11   provisions of the Bail Reform Act, because he does not

12   currently present a serious risk of flight or obstruction, and

13   any risk he does present can be accounted for by the conditions

14   which will reasonably assure the Court of his appearance and

15   the safety of the community.

16          Unlike other serious cases, this is not a case where

17   there's a presumption of detention.  The Bail Reform Act starts

18   from a point of release.  It's the government's burden here and

19   one they cannot sustain under these facts.

20          The Probation Department has gathered many of these

21   facts for the Court and offers its considered recommendation of

22   release of Mr. Teixeira under appropriate conditions to which

23   we concur and add.  He is entitled to release, and he should be

24   released.

25          As I said, Mr. Teixeira remains still a 21-year-old

1   kid living in the only community he has known his whole life,

2   the only place he has to call home.

3           I speak generally and not about these allegations that

4   bring us here today when I say that a young adult's, mid-teens

5   through early 20s, are not universally our best selves where we

6   mature perfectly.

7           Mr. Teixeira enlisted in the National Guard in the

8   fall of his senior year of high school.  He was raised by his

9   mother, his father, his stepfather, all stable supports, all

10  who are here for him.  They love him and stand ready to support

11  him throughout this ordeal.

12          They are the foundation for the answer that the Court

13  should reach that Mr. Teixeira poses no risk of flight or

14  obstruction, and that there are appropriate release conditions

15  which will assure his appearance and the safety of the

16  community.

17          The government is asking you to infer from what it

18  presented in its memorandum last night and today that this

19  product of North Dighton, Massachusetts, presents such a

20  serious risk that he's going to run or obstruct the process

21  that he must be detained.

22          It offers in its memorandum what I think is an

23  imaginary likelihood that Mr. Teixeira stands to be rescued by

24  some foreign government's clandestine efforts to whisk him away

25  from his home in North Dighton.

1          What --

2          THE COURT:  Well, Mr. Kelley, do you disagree that

3    given the fact that the defendant has had access to top-secret

4    information and other very sensitive information that foreign

5    governments would be interested in what information he may

6    have?

7          MR. KELLEY:  I --

8          THE COURT:  I'm talking about what's in his head.

9    Let's -- let's assume your -- your proposition that he's not

10   getting access to any further documents, but some of the -- at

11   least according to the information the Court has been provided,

12   some of the information he actually copied.  In my own

13   experience if I sit down and I write something, I'm going to

14   remember it reasonably well, and I -- I'm not so sure that the

15   government's concern is entirely imaginary.  Information about

16   the Russian-Ukraine war actually strikes me as extremely

17   relevant and perhaps valuable.

18         I don't know about other information that the

19   defendant may have gotten access to or used his access to get

20   to, but I think it's a legitimate concern.

21         MR. KELLEY:  Well, Judge, I speak to the notion that

22   the government has asserted in its memorandum that Mr. Teixeira

23   will be taken away by some foreign government.  That's what

24   they posit in their memorandum, and I suppose in the abstract I

25   don't disagree with the Court that some foreign government

1    might be interested in what Mr. Teixeira or any other person

2    with top-secret security clearance would have in their mind,

3    but I think what the question here under the Bail Reform Act is

4    how serious is the risk that this is going to occur?

5            THE COURT:  Right.  But Mr. Teixeira is in a slightly

6    different position than any other person who has access to

7    top-secret information, because he has already demonstrated

8    that he is prepared to disclose it, at least so the allegations

9    say.

10           MR. KELLEY:  So the allegations say, your Honor.

11           THE COURT:  Well, right, but I mean it's -- I have

12   probable cause to believe that that's the case, and as

13   addressed in the government's memo, the evidence of that

14   is -- is fairly compelling.  But -- and the other thing is

15   people who have access to top-secret information are not facing

16   the charges that this young man is facing.  You know, in making

17   a recommendation that the defendant be released, probation --

18   and it says this explicitly.  They do not consider the

19   penalties, but I mean that's what the -- that's what the law

20   is, so I have no quarrel with that, but it strikes me as

21   ignoring an extremely relevant factor.

22           So I do think Mr. Teixeira is in a slightly different

23   position than the other people who have access to top-secret

24   information.

25           MR. KELLEY:  I understand the Court's concern, your

1  Honor.

2          THE COURT:  Okay.

3          MR. KELLEY:  I think that the Bail Reform Act first

4  sets that threshold; and obviously, the second threshold is are

5  there conditions that can be set that can reasonably assure the

6  Court that that won't occur.

7          And so turning back to this notion that Mr. Teixeira

8  is such a serious risk of flight, Judge, I think here the

9  evidence before the Court is that where the government might

10  ordinarily assert that wealth and access to -- to means might

11  increase someone's risk of flight, here they've -- they've done

12  the opposite.  They say Mr. Teixeira's meager income with the

13  Air Force is reason for him to engage in what they suspect

14  would happen if he's released, and I think that there's just

15  no -- no evidence of that, Judge.

16          I think that that imagining comes below a serious risk

17  and beyond a reasonable assurance and to guarantees which is

18  what the government is seeking here, and that's not what the

19  Bail Reform Act calls for.

20          More than all of this, though, Judge, I think the

21  circumstances of Mr. Teixeira's arrest provide the Court with

22  the answer that as he stands before you, he poses no such

23  risks.  The government in its affidavit and argument suggest

24  that Mr. Teixeira knew about the media recording, which

25  initially broke on April 6th, and continued through his arrest

1    one week later.

2          We proffer that on the 13th, reporters with the New

3    York Times appeared in his mother's driveway wanting to speak

4    with him.  He wasn't home.  His mother and his stepfather

5    counseled him to come home and told him why.  And he didn't run

6    away.  When the New York Times publicly accused him of leaking

7    classified documents, he did not run away.  Instead, with the

8    circling media, an arm of law enforcement showing up in his

9    mother's driveway, he sat on his mother's porch reading the

10   Bible.

11         Agents ordered him to walk out to the front of the

12   house.  He didn't run away.  That's what we've provided the

13   Court with in Exhibit 1.  He responded.  He followed their

14   orders to the letter of what they asked him to do.

15         And the law enforcement presence did not end with

16   Mr. Teixeira's arrest.  Agents would search the home of his

17   mother late into the night and into the early morning leaving

18   no stone unturned no doubt.

19         In the early morning hours of April 14th, that same

20   armored personnel vehicle showed up in his father's driveway,

21   ordered his father out of his house, and agents searched his

22   home up and down surely.

23         The events of April 13th and 14th at that -- at those

24   two residences two miles apart in the place these people have

25   called home for two decades should lead the Court to the

37

1    conclusion that the government cannot sustain its burden of

2    proving a serious risk of flight or obstruction is currently

3    present.

4         But even if the Court can convince you of those two

5    things, as I said, the Bail Reform Act here doesn't end there.

6    He is still entitled to release, because there are conditions

7    available which can reasonably assure the Court of

8    Mr. Teixeira's appearance, compliance with judicial procedures,

9    and the safety of the community.  These are the standards under

10   the Bail Reform Act.

11        The Probation Department suggests to the Court that

12   Mr. Teixeira be released to his father, acting as a third-party

13   custodian under his supervision; that Mr. Teixeira have no

14   contact with any potential witnesses; that he have no access to

15   any firearms; that he have no access to the internet.  Other

16   conditions that we've suggested to the Court: that he not leave

17   the residence except for in the presence of his father or Air

18   Force personnel or counsel; that he be on home detention there.

19        The Probation department is not asking for GPS

20   monitoring, but that is surely available to the Court, and his

21   parents have also offered to post any kind of monetary surety

22   that the Court requires, including their homes.

23        The Bail Reform Act counsels the least restrictive set

24   of conditions which can reasonably assure appearance and

25   compliance and safety here.  In our memo we talk about the

1    3142(g) factors, which direct the Court to consider and weigh

2    those factors and whether the combination of conditions can

3    make those reasonable assurances.  The first being the nature

4    and circumstances of the offense.

5         As we understand the government's allegation in the

6    complaint affidavit and what it has provided to the Court,

7    Mr. Teixeira stands accused of removal of sensitive

8    information, which he shared in what the affidavit describes as

9    a small private online community.

10        We hear no allegation or suggestion that Mr. Teixeira

11   himself ever intended anything to be widely available or sought

12   to harm the interests of the United States in what the

13   government has presented.

14        THE COURT:  Mr. Kelley, somebody under the age of 30

15   has no idea that when they put something on the internet that

16   it could end up anywhere in this world?

17        MR. KELLEY:  I --

18        THE COURT:  Seriously?

19        MR. KELLEY:  I don't know for sure, Judge, what the

20   exact circumstances of that are.

21        THE COURT:  But the circumstances of this offense is,

22   as alleged, the defendant put sensitive and top-secret

23   information on the internet, and your argument is he had no

24   idea it might go somewhere beyond this little circle of people

25   on the server?

1          MR. KELLEY:  My argument, Judge, is that what the

2    government has provided does not include any allegation that

3    Mr. Teixeira intended for that to happen.  And, in fact, what

4    they provided shows in what they provided here --

5          THE COURT:  I mean I point the gun at somebody's

6    heart, I pull the trigger, but I don't intend to kill them?

7          MR. KELLEY:  I think, Judge, we're -- we're in a

8    complex situation of what exactly this online community is, who

9    has access to it, and what that is.  I think it's more akin,

10   this allegation, to bringing something to someone's home or

11   sharing it with your friend and not expecting that to go

12   further.  I don't know everything.  And moreover, Judge, I

13   think that that's partially what concerns us here is that this

14   is so early in the process of this case.  So we do not know

15   that.

16         THE COURT:  Well, I've got to tell you, I find it a

17   little incredible that the defendant could not foresee that

18   possibility.

19         MR. KELLEY:  I would point, Judge, the Court to

20   Exhibit 8 of the government's submission.

21         THE COURT:  Can you give me a letter?

22         MR. KELLEY:  I believe it's tab I, Judge.

23         THE COURT:  Are these the text messages?

24         MR. KELLEY:  The text messages, Judge.

25         THE COURT:  Okay.  I'm there.

1          MR. KELLEY:  The purported chat quote at page 5 of

2     that exhibit suggests no knowledge or condoning of that at all,

3     and that's where I take that statement, Judge.

4          The nature and circumstances of the offenses -- of the

5     offense presented here by the government suggests that any

6     perceived risk presented can be adequately accounted for by the

7     release conditions that we proposed with reasonable assurance.

8          To answer the question why, it's because under these

9     conditions he would no longer have any unsupervised access to

10    the internet whatsoever.  He would have no internet access, and

11    he would be at locations that have been searched up and down,

12    and nowhere else taking everything -- the law enforcement

13    taking everything to which they're entitled under the search

14    warrant permission.  And the Court can be reasonably assured,

15    because he can be precluded through supervision from having

16    contact with anyone off line as well and knowledge of that.

17         And to answer the question of what makes us be able to

18    have the reasonable assurance he will follow those orders given

19    the nature of the case, Judge?  I go back to what happened on

20    that porch and in that driveway.  And because his father is a

21    reliable person who takes the situation with the extreme

22    seriousness it deserves.

23         The second factor under 3142(g), your Honor, is

24    obviously the weight of the evidence, and this is what I was

25    speaking to earlier.  The government determines, I think, that

1    its evidence is strong, but I think there's a serious danger in

2    placing any significant trust in what the characterizations are

3    at this stage of the proceeding.

4          Like any case, there are issues here that are ripe for

5    investigation, for litigation.  It is extremely early in this

6    process, and I think it's dangerous to characterize the

7    strength of what this case will become, because it too strongly

8    counters the bedrock of our system, which is the presumption of

9    innocence and proof beyond a reasonable doubt, and I would say

10   skepticism of the government's contentions against anyone until

11   12 fellow citizens pass judgement.

12          THE COURT:  Well, then, how do you hold anybody

13   pretrial?

14          I mean, Congress told me I need to consider the weight

15   of the evidence.  That's what it's --

16          MR. KELLEY:  This is a factor.

17          THE COURT:  I'm required to consider it.

18          MR. KELLEY:  This is a factor.

19          THE COURT:  We're having a detention hearing.  It's

20   time to consider that.

21          MR. KELLEY:  Yes.

22          THE COURT:  I can't wait for an indictment, discovery,

23   jury, jury trial, verdict --

24          MR. KELLEY:  Yes, Judge.

25          THE COURT:  -- in order to make a decision about

1    release or detention.

2           MR. KELLEY:  And I would refer the Court to our

3    memorandum in which we have asserted there's case law that says

4    that that is the least important factor.  It can be the least

5    important factor.  It is a factor, it's clear in 3142(g).

6           THE COURT:  I --

7           MR. KELLEY:  I guess --

8           THE COURT:  I respect the Ninth Circuit.  It's not

9    controlling.  I'm not sure I always agree with it.  I actually

10   think it's squarely relevant.  If you have a very strong case

11   and you have somebody facing jail, it makes the prospect of

12   jail that much more of a reality than a weak case does.  I

13   mean, I've had plenty of defense attorneys, good ones like

14   yourself, Mr. Kelley, argue to me that the case is weak and,

15   therefore, you know, the defendant should be released because

16   the chance of a conviction is -- is actually fairly small.

17           Again, it's a very relevant argument.

18           MR. KELLEY:  Well, I guess I would respond, Judge,

19   that the design of the Bail Reform Act isn't the government

20   says it has an open and shut case, and the person is detained.

21   Regardless of any weight asserted by the government or found by

22   the Court, the question centers on reasonable assurance of

23   appearance and safety, and I turn back to what gives us that

24   reasonable assurance.  Because of what happened on that porch

25   and in that driveway; because his father is a reliable person

1    who takes this situation with the extreme seriousness it

2    deserves.

3         The third factor under 3142(g) is the history and

4    characteristics of Mr. Teixeira, and I think we take a starkly

5    different view of what the government has argued here.  The

6    statute speaks in broad terms here of character, physical and

7    mental condition, family ties, employment, financial resources,

8    length of residence in the community, community ties, past

9    conduct, history relating to drug and alcohol abuse, criminal

10   history, record of appearance at court proceedings, and whether

11   the person was on probation, parole, or pretrial release.

12        This long list in the Bail Reform Act singles out as

13   important when determining whether someone will show up, listen

14   to the Court's directives.

15        I don't think I need to reiterate Mr. Teixeira's deep

16   and significant ties to the community.  He has no prior

17   criminal record.  He has no substance use history.  He retains

18   the support of his family.  His financial circumstances and

19   that of his family are modest.  Each and every one of these

20   conditions pushes towards that reasonable assurance to release

21   Mr. Teixeira.  And I think it's appropriate to consider

22   Mr. -- not just Mr. Teixeira's background, but that of his

23   father, who will be responsible to the Court for him.  Like his

24   son, each and every one of those factors leads to the

25   conclusion that the Court can reasonably rely on Mr. Teixeira's

1   father.

2        He is uniquely positioned to offer supervision as

3   third-party custodian both by his background and this

4   residence.  As you heard, he was born in Taunton.  He had a

5   first career as a correctional officer at Bridgewater State

6   Hospital.  He has had steady employment for the last 19 years.

7   He leads a steady life.  He will be vigilant about any

8   conditions set by this court.

9        We've provided the Court with Exhibit 4, which shows

10  those door cameras that would alert directly to him, and he

11  would in turn respond to whoever the Court directs him to

12  respond to.  If there is one toe over the line, he would be

13  aware of anyone coming or going from the house and is willing

14  to enforce any restriction that this Court sets.  He is aware

15  of the nature of the case and the allegations against his son.

16  He is serious and expresses no hesitation about reporting

17  violations to the Probation Department.

18        The government spent a lot of time talking about this

19  last factor under 3142(g), that in setting conditions, the

20  Court take into account the nature and seriousness any danger

21  to any person in the community posed by release and set

22  conditions appropriate.

23        It might seem shocking to say given what the

24  government has presented to the Court in its pleadings, in its

25  characterization, but I would say to the Court Mr. Teixeira

1    poses no danger to this community if he is released.  He will

2    have no access to any firearms.  His ownership of firearms that

3    the government has put before this Court has been at all times

4    lawful and not exceptional in this part of Massachusetts and in

5    his community.

6            He is not unique in collecting and utilizing firearms

7    entirely consistent with the stringent requirements of

8    Massachusetts law.  Some people are car guys, some people like

9    boats.  Some people collect guns and shoot recreationally.

10           The government rests heavily on two categories to

11   advance its danger arguments:  Something that occurred during

12   Mr. Teixeira's sophomore year of high school.  It presented the

13   Court in this sealed filing that many kids and staff spoke with

14   the police, and it was by no means to my reading of that

15   universal that everyone believed that Mr. Teixeira was

16   threatening to do anything.

17           More than one person found it not unusual for him to

18   talk about firearms, because that was his interest.  These are

19   kids that knew him, that grew up with him, and went to schools

20   with him.  They knew he was into military gear and history.

21           Ultimately, the school required him to obtain a

22   professional psychiatric evaluation.  His parents did so, and

23   he returned to school within days.

24           The police closed out any report, no further action

25   was taken, and he continued to complete his school at

1    Dighton-Rehoboth without incident.

2          The government produces chats purportedly between

3    Mr. Teixeira and other online persons that any court would be

4    concerned with when you read those.

5          If I recall that the government has interviewed,

6    according to its filings, multiple people in these online

7    communities, and we have no evidence here that Mr. Teixeira did

8    anything or took any steps consistent with these purported chat

9    messages.

10         I can understand the Court's concern, but the Bail

11   Reform Act still requires release, because the conditions

12   proposed reasonably assure that he will have no access to any

13   firearm or violent means.

14         The Probation Department has recommended removal of

15   the firearms from his father's house, and that has been done in

16   a lawful manner.  And indeed, the government has argued in its

17   filings that Mr. Teixeira had these firearms right next to his

18   bed.

19         Well, Judge, when you turn to the exhibits that the

20   government provided, in Exhibit G, the government shows the

21   photographs of two bedrooms.  It's a little disjointed.  One is

22   at his father's house, one is at his mother's house.

23         Now, Mr. Teixeira stored these firearms, lawfully

24   owned, in the proper manner in a locked gun safe in his room

25   amongst his other possessions.  This is his part of the world.

1    And when the FBI showed up to that room and searched that room,

2    they had to take a drill and drill open the gun safe because it

3    was properly stored.

4         I want to correct some -- perhaps some misconceptions

5    about the photographs that the government submitted here in

6    Exhibit G.  I said they're disjointed, and that's because the

7    top photographs are both from Mr. Teixeira's room at his

8    mother's house.  The bottom two photographs are from rooms at

9    his father's house.

10        The first photo in Exhibit G at the top is a wall on

11   Mr. Teixeira's room, and you can see just barely here on the

12   right a poster of an F-15.  You see also in the -- in the

13   photograph, a picture from a gun range.  Again, some people

14   collect cars, some people like boats, some people like to shoot

15   recreationally, and this is what is expected.

16        This does not present any sort of danger, and it's the

17   exact same thing that you see on the following page in another

18   section of Mr. Teixeira's room, from a firing range.

19        And I'd point out for the Court not only in that room

20   do you see that poster, but you also see a teddy bear.  You see

21   a Lego -- a military-style Lego plane still there.  This does

22   not show that Mr. Teixeira is a danger if released to the

23   community.  The bottom two photos of Exhibit G, Judge, these --

24        THE COURT:  These are the two bedrooms?

25        MR. KELLEY:  These are the bedrooms at his father's

1    house.  The one with the camouflage wallpaper is Mr. Teixeira's
2    room at his father's house.  It no longer has the ghillie
3    netting.  It no longer has the poster of the service members,
4    one of which is his cousin.  It no longer has any items on the
5    bookshelf.  It is a bare room but for that bed and the
6    bookshelf.
7           The bottom of the second page is not, in fact,
8    Mr. Teixeira's bedroom.  It is his father's bedroom and a lost
9    space, and what you see on the other side of the wall in the
10   closet that you see there is the -- on the other side of that
11   is Mr. Teixeira's room at his father's house.  Mr. Teixeira's
12   father's room does not have any door.  So he would be able to
13   see and hear everything that's going on upstairs.  This is
14   upstairs.
15          Now, one of the things that I did want to make sure
16   that there was no misapprehension about.  What's depicted in
17   this photo that the government presents is what appears to be
18   firearms atop of an oaken chest at the foot of the bed.  Those
19   are not firearms.  Those are toys.  Those are airsoft rifles,
20   toys.
21          The firearms that Mr. Teixeira's father had were
22   stored lawfully in a box in the closet and have now been
23   removed.  So there is no danger and no risk that Mr. Teixeira
24   will obtain any firearms if the Court releases him under
25   conditions.

1    And turning to the exhibits again, our Exhibit 4, that

2    shows each and every door out of the house equipped with the

3    Ring camera and his father having access to that at all times.

4    The Court had some questions about Mr. Teixeira's

5    status with the military at this point.  I think probably the

6    government has talked to their counterparts, and we've talked

7    to our counterparts, and we've provided the Court with what our

8    understanding is, and that is that Mr. Teixeira is represented,

9    has been appointed military counsel, that there is no uniform

10   military code of justice court-martial proceedings that have

11   been initiated.  There may be separation proceedings at some

12   point in the future, but there is a process, and our

13   understanding is that that would take some time.

14   It's our understanding that if the Court does release

15   Mr. Teixeira and does not confine him to his father's house at

16   all times that Mr. Teixeira would still have orders to report

17   for duty.  He's still under the control of the Air Force.  It's

18   our understanding that the Air Force would be able to transport

19   him to and from that duty by Air Force personnel under direct

20   supervision, and he would not be in any sensitive position.  I

21   think some sort of assignment in the chaplain's office, in the

22   gymnasium, some other area where he'd have duty, because he's

23   under their control but would not have access whatsoever.

24   If the Court releases Mr. Teixeira and restricts his

25   movement to his father's house, not reporting him for duty,

1    then Mr. Teixeira would remain confined there.

2           Our understanding, Judge, is that under any decision

3    the Court makes, release without home confinement, release with

4    home confinement, or no release at all, Mr. Teixeira's chain of

5    command remains responsible for ensuring his health, safety,

6    and well-being by checking on him regularly.  That's what we've

7    been provided, and that's the directives we provided to the

8    Court.

9           It's our understanding that Mr. Teixeira does

10   currently have a senior master sergeant designated to him with

11   the responsibility of checking on him.  As we said in the

12   memorandum, the individual is a government agent with loyalty

13   that will always be with the government and the mission of the

14   Air Force.  It's not a privileged relationship, and this person

15   has no duty of loyalty to Mr. Teixeira.

16          It strikes me as similar to the neutral status of a

17   probation officer.  This is not something, obviously, that the

18   Court orders itself, but it's something that can ensure an

19   extra layer of support and supervision of Mr. Teixeira, which

20   adds to the reasonable assurance that Mr. Teixeira will appear

21   and follow Court directives in this case.

22          I think if the Court wants more fulsome information,

23   we can certainly obtain that, because there seems to be some

24   disagreement from the government that that's the case and that

25   that's what these memorandums direct.

1          But, Judge, I would end where I began, this may be a

2     unique set of facts, but the Bail Reform Act directives

3     operates just the same.  The government cannot satisfy its

4     burden of showing that this case presents a serious risk of

5     nonappearance or obstruction, and any risk can be reasonably

6     accounted for by the whole host of conditions available and

7     regularly employed in federal court.

8          You have a young man before you who didn't flee, who

9     has nowhere to flee, who has the strong support of his family

10    and the place he has lived his whole life.  He can be released

11    to a diligent and responsible third party, and the case will

12    proceed.  He will answer the charges.  He will be judged by his

13    fellow citizens.  The Court should order his release on the

14    least restrictive conditions as required under the Bail Reform

15    Act, and that is what we're asking for, your Honor.

16          I'm happy to do my best to resolve any other questions

17    that the Court has.

18          THE COURT:  Is there some tension between this

19    supervision that would come from the Air Force and the notice

20    of representation filed by the chief district defense counsel?

21          For instance, I'm not -- I'm on page 17 of your memo.

22    I thought that I had read this morning that, among other

23    things, the Air Force would make -- would examine the house and

24    make sure that it's appropriate for him to be there, but the

25    notice of representation, item 2 says, Prior consent for any

1    search or seizure, including his person or property, and then

2    I'm skipping to the end of the sentence, is hereby withdrawn.

3         And I -- I assume that anyone checking in on the

4    defendant would be telling him not to discuss the case, to

5    further comply with the notice.

6         But I guess my question is:  Is there some tension

7    between those two?

8         MR. KELLEY:  I don't think that there's tension in it,

9    Judge, because there's two separate and different things going

10   on here.  I think the notice of representation is directing

11   that if there's any interrogation or other thing -- other

12   discussion about the case itself that there's notice that the

13   individual is represented.

14        What I think the obligations to Mr. Teixeira from the

15   Air Force, as I understand them, are to ensure that he's not a

16   danger to himself, that he's in a safe place, that he has got

17   food, that he has got everything that he needs in order to be

18   safe.

19        And so I think that's slightly different than what the

20   notice of representation is designed to be doing here.  It's

21   effectively this individual's responsible for making sure that

22   he's okay, not that they're doing any sort of investigation or

23   anything like that.

24        THE COURT:  Okay.  I -- I'm reading from page 18 of

25   your memo, the second line, this means that Air Force personnel

1    may enter and inspect Mr. Teixeira's living quarters, in this

2    case his father's home, to make sure they are suitable and

3    comply with any court order.

4           I'm not sure that that squares with the notice of

5    representation that I don't want anybody searching anything.  I

6    mean we can get into a nuanced argument about whether examine

7    is different than search, but...

8           MR. KELLEY:  I think, Judge, that the bottom line here

9    is the Air Force has a duty to inspect his living quarters to

10   make sure that he's safe, not to be looking to uncover any

11   evidence or anything like that.  That's what we take from our

12   counterparts in the Air Force, Judge.

13          THE COURT:  Fair enough.

14          Does the defendant's father and do his -- does his

15   mother and stepfather own the homes they live in?

16          MR. KELLEY:  They do.

17          THE COURT:  One of your attachments is the

18   January 25th, 2019, memo.  It's about 51 pages.  Are there any

19   particular -- I mean I looked at the general material.

20          Is there any particular part you wanted me to look at?

21          MR. KELLEY:  No, your Honor.  Our understanding of

22   that is essentially the larger of the checklist that comes in

23   the other exhibit.

24          THE COURT:  Okay.

25          MR. KELLEY:  Sort of the basis, if you will, for that

1     checklist.

2              THE COURT:  Right.  And just one last thing, I think

3     you -- you clarified this in your argument, but I think also on

4     page 18 of your memo, yes, nature and seriousness of the

5     danger.  Your second sentence, instead it's referring to the

6     government's filing.  Its supplemental memorandum posits

7     speculation to argue what they otherwise cannot in the first

8     instance that he's a danger to the community if released.

9              Just I want to make sure I'm clear that it's not your

10    position that I'm prohibited from considering the nature and

11    seriousness of any danger that would be caused by release?

12             MR. KELLEY:  No --

13             THE COURT:  Okay.

14             MR. KELLEY:  -- I think 3142(g) includes that.

15             THE COURT:  All right.  Okay.  Thank you.

16             MR. KELLEY:  Thank you.

17             THE COURT:  Ms. Pellegrini, it's the government's

18    motion.  I'll give you the last word, if you have anything.

19             MS. PELLEGRINI:  Briefly, your Honor.

20             First of all, I think that in looking over the

21    government's memo as counsel was speaking, the government did

22    not suggest that whisking the defendant away would be the only

23    manner and means by which those who seek to know what he knows

24    would be available to him.  What we said was they could provide

25    him the means to leave the jurisdiction.

1          I also don't think that given prior cases, including

2    Edward Snowden, that is at all speculative to assume that

3    someone in this position would be an attractive target.  And as

4    we all know, Mr. Snowden currently resides in Russia.

5          The other matter is, as I mentioned, we related --

6    related the school incident because of the fact that it showed

7    to us that Mr. Teixeira was willing to say whatever

8    he -- whatever he needed to say in order to gain what he

9    wanted.  We have never argued that his possession of firearms

10   is illegal.

11         What we had said about the danger relates to the

12   possible continued dissemination of classified material, and

13   what we also said was that we were concerned about even with

14   the assurances that he would somehow have a device by which he

15   could connect with the internet and continue his either

16   conversations or potential dissemination, because we haven't

17   recovered documents at this point.

18              THE COURT:  Okay.  Thank you.

19         I was able to go through things this morning, but I

20   want to go back through them in light of your arguments.

21         I do want to commend both sides for all the work that

22   you did preparing for the hearing.  The memos were both

23   excellent, and I appreciate the time that went into it.

24              So I'm going to take the matter under advisement.

25              Thank you.  We're in recess.

1                THE CLERK:  The Court stands in recess.

2           (At 2:24 p.m., court was adjourned.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                       C E R T I F I C A T E

2

3          I, Marianne Kusa-Ryll, RDR, CRR, do hereby

4    certify that the foregoing transcript is a true and accurate

5    transcription of my stenographic notes before the Honorable

6    David H. Hennessey, to the best of my skill, knowledge, and

7    ability.

8

9

10   /s/ Marianne Kusa-Ryll                        4/29/23

11   Marianne Kusa-Ryll, RDR, CRR                  Date

12   Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25